**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PAUL BEVERAGE CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:17CV2672 JCH |
| | ) | |
| THE AMERICAN BOTTLING CO., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant The American Bottling Company's Motion for Summary Judgment, filed December 6, 2018. (ECF No. 40). The motion is fully briefed and ready for disposition.

## BACKGROUND

Plaintiff Paul Beverage Co., Inc. ("Paul Beverage" or "Plaintiff"), is a Missouri corporation with its principal place of business located in Jefferson County, Missouri. (Defendant The American Bottling Co.'s ("ABC" or "Defendant") Statement of Uncontroverted Material Facts in Support of its Motion for Summary Judgment ("ABC's Facts"), ¶ 1). ABC was a successor-in-interest to Seven Up Bottling Company of St. Louis, Inc., and is a Delaware corporation with its principal place of business located in Plano, Texas. (*Id.*, ¶ 2).

On or about November 26, 1990, Paul Beverage and ABC entered into a "Distributor and Consignment Agreement" ("Agreement"), whereby the parties agreed that Paul Beverage, as an independent business enterprise, would distribute ABC's products pursuant to the terms of the Agreement. (ABC's Facts, ¶ 4). The Agreement contained the following relevant provisions:

> <u>Distributor's Opportunity</u>…..The Company (ABC) will enter into such an Agreement with only one (1) Distributor (*i.e.*, Paul Beverage) for responsibility to distribute the Company's Scheduled Products in any given market area which

shall be a part of the geographic areas served by the Company and which shall be referred to as the "Distributor's market area of responsibility". In each such case, the Company thus depends upon that Distributor to provide, and Distributor is personally obligated to Company to provide, the effective, consistent and regular distribution, timely deliveries and adequate market representation (as further set out herein) of the Company's Scheduled Products in the Distributor's market area of responsibility to enable Company to satisfy its own obligations to its franchisors and trademark licensors of market penetration and service and supply of products to retail outlets on a consistent and regular basis, by means of store door delivery and shelf stocking, and that Distributor shall remain ultimately responsible to Company for the performance of Distributor's obligations hereunder….

I. <u>Services to be performed by Distributor</u>:

For the period of this Agreement and in accordance with its terms and conditions, Distributor shall:

    A.    <u>Capability</u>. Provide such working capital, personnel, equipment, warehouse space and other areas as may be necessary to operate properly as a Distributor and to satisfactorily perform the obligations of this Agreement….

    C.    <u>Obligation to Distribute</u>: Distribute on behalf of the Company such Scheduled Products as may be offered for sale by the Company and which may be from time to time itemized on the Distributor's Allowance List and List of Scheduled Products, as it may be amended, as may be necessary to provide effective, consistent and regular distribution, timely deliveries and adequate market representation by the service and supply of such Scheduled Products to retail outlets, by means of store door delivery and shelf stocking, in the Distributor's market area of responsibility and to enable Company to meet[] its obligations to its franchisors under Company's various franchise agreements.

    D.    <u>Market Development</u>. Aggressively promote the distribution of the Company's Scheduled Products throughout the Distributor's market area of responsibility and energetically develop new outlet distribution in its market area of responsibility….

II. <u>Obligations on the part of the Company</u>:

On its part, the Company hereby agrees for the term of this Agreement as follows:

A. <u>Fill Orders</u>. It shall make reasonable efforts to fill each order received from Distributor for delivery to Distributor of such Scheduled Products from time to time offered for sale by the Company through Distributor….

D.  <u>Advertising and Promotion</u>.  The Company shall provide to Distributor such advertising and sales promotional material as the Company may from time to time have available, it being understood that Distributor shall have no obligation hereunder to purchase any such material.  The Company shall provide public relations, marketing and merchandising services to publicize and promote the Scheduled Products consigned to Distributor by the Company….

IV.  <u>Miscellaneous Provisions</u>:…

B.  <u>Term and Termination</u>.  The term of this Agreement shall be for an indefinite period….

In any event, such Agreement will terminate automatically upon the death of the Distributor, if an individual, or a material change in the ownership or operating form of the Distributor, whether voluntarily or by operation of law or, in either case, on Distributor's bankruptcy or open and notorious insolvency.  A "material change of ownership" as used above shall mean a change of partners, or addition of a partner, if Distributor is a partnership or a change in corporate control, if Distributor is a corporation….

Anything to the contrary hereinabove further notwithstanding, Company may terminate this Agreement upon thirty (30) days' written notice to the Distributor given at any time in the manner described above, but only on the following grounds:  for failure of Distributor to aggressively promote the sale of Company's Scheduled Products within Distributor's market area of responsibility; or for any dishonest act to a Distributor's customer or to the Company; or for conduct of Distributor detrimental or not appropriate to the business of distribution of Company's beverages and products; or for material failure to comply with the terms of this Agreement; or upon Distributor's failure to pay over to or remit to Company any funds or money properly due and owing by Distributor to Company or which is the property over which there is not a bona fide dispute between Distributor and Company with regard to the amount due to Company; or upon a substantial change of the form or method of doing business by Company, whether or not such change shall be unilaterally determined by Company, which change of form or method of doing business shall materially affect the form or method of distribution of Company's beverages and products.

In the event of any termination by the Company, or of automatic termination, or of termination by bankruptcy or insolvency or by death, or by material change in ownership or operating form of Distributor, the Company shall purchase any beverage truck(s) and other equipment owned and used by Distributor in performing Distributor's obligations under this Agreement at their "fair market value" and Distributor shall sell the same to Company at their "fair market value";…

(Agreement, attached to ABC's Facts as Exh. A, PP. 1-3, 5, 6, 9, 10-11).

Prior to 2016, Paul Beverage operated as a warehouse distributor, meaning it serviced customers using inventory maintained in its own warehouses. (Plaintiff's Statement of Additional Material Facts ("Plaintiff's Facts"), ¶¶ 7, 8). In early 2016, Paul Beverage maintains ABC approached it, and asked if Plaintiff would take additional territory and customers in South St. Louis County and South St. Louis City. (*Id.*, ¶ 17). Paul Beverage began servicing the new territory in approximately March, 2016. (*Id.*, ¶ 18).

Also in early 2016, ABC asked Paul Beverage to move to a cross-docking operation. (Plaintiff's Facts, ¶ 25). Under cross-docking, rather than maintain inventory in the distributor's warehouse, product is received by the distributor from ABC's Hazelwood facility daily. (*Id.*, ¶ 26). Those products are then reloaded onto the distributor's trucks for delivery to customers. (*Id.*). Paul Beverage began cross-docking in July, 2016. (*Id.*, ¶ 28). According to Mark W. Paul ("Mark Paul"), the President of Paul Beverage from April, 1983 to July 28, 2017, Plaintiff experienced issues after the move to cross-docking including, but not limited to, late deliveries, deliveries of fallen and damaged product, deliveries of incorrect trailers and product, and incomplete deliveries due to out-of-stock product in ABC's Hazelwood facility. (*Id.*, ¶ 30, citing Mark Paul Declaration, attached to Plaintiff's Facts as Exh. 3, ¶ 15).[1] Charles Parish, Plaintiff's

---

[1] ABC disputes that the issues existed, and/or that they were caused by ABC. (*See* ABC's Response to Plaintiff's Facts, ¶ 15). Plaintiff, however, cites to testimony from Charles Parish, the district manager responsible for Paul Beverage, in which he confirms that once Paul Beverage was moved over to cross-docking, shipments frequently were received late from Hazelwood, the wrong load was sent at times, product fell down in transit almost daily (and Paul Beverage had to rebuild the pallets), and out-of-stock situations occurred at times. (Plaintiff's Facts, ¶¶ 5, 30, citing Parish Dep., attached to Plaintiff's Facts as Exh. 6, PP. 202-05). Mr. Parish further testified that the problems Plaintiff experienced were similar to those that another distributor, D&D, experienced after moving to cross-docking. (*See* Parish Dep., P. 205). Mr. Peter Moore, the branch manager responsible for Paul Beverage, also testified that after the move

district manager[2], confirmed that if there were delays with product coming in, that would cause a "domino effect", including problems with merchandising. (*See* Plaintiff's Facts, ¶ 31, citing Parish Dep., PP. 205-06).

With respect to promoting Defendant's product, ABC asserts it had an incentives program designed to increase both the distributor's earnings and ABC's sales, but that from 2015 to 2017, Paul Beverage failed to meet incentives goals on many more occasions than other similar distributors. (ABC's Facts, ¶¶ 10-11, citing Dan Schmidt Decl., ¶¶ 9, 10 and attached Exh. B). Plaintiff disputes ABC's claim on several fronts. First, Plaintiff maintains the document cited by ABC, Exhibit B, actually reflects that Paul Beverage met as many or more incentive levels in numerous months than one or more of the comparison distributors. (*See* Plaintiff's Response to ABC's Facts, ¶ 10, citing ECF No. 43-2, PP. 4-15, 17-19, 21-23). Plaintiff further maintains that ABC failed to provide materials to Paul Beverage necessary to meet goals within the incentives program on at least ten occasions; that ABC did not always credit Paul Beverage for achieving goals in the incentives program; and that Paul Beverage engaged in its own promotion of ABC's products, by sponsoring or donating product at its own expense to fundraising events held by churches, police organizations, the Rotary Club and the local Chamber of Commerce. (Plaintiff's Facts, ¶¶ 55, 56, 58, citing Parish Dep., PP. 61-63, 83; Mark Paul Dep., attached to Plaintiff's Facts as Exh. 10, PP. 68-69, 70; Mark R. Paul Dep., attached to Plaintiff's Facts as Exh. 11, PP. 223-224; Mark Paul Decl., ¶ 31).

---

to cross-docking Plaintiff experienced out-of-stock situations and late deliveries. (Plaintiff's Facts, ¶¶ 4, 30, citing Moore Dep., attached to Plaintiff's Facts as Exh. 7, P. 98).

2 The chain of supervision of distributors at ABC was as follows: district managers supervised distributors and reported to a branch manager, the branch manager reported to an area director, and the area director reported to a regional vice president. (Plaintiff's Facts, ¶ 1). At various relevant times, Plaintiff's supervisors were as follows: Nate Green, John Kiely, and Charles Parish were district managers; Pete Moore was the branch manager; Daniel Schmidt was the Area Director; and Robert Matson was the Regional Vice President. (*Id.*, ¶¶ 2-5).

With respect to performance, it is undisputed that Paul Beverage's drivers were instructed to deliver all product in their trucks. (ABC's Facts, ¶ 18). Despite this instructive, Mark Paul testified there were occasions where drivers would fail to complete their routes during the day. (*See* Excerpts of Mark Paul Deposition, attached to ABC's Facts as Exh. B, PP. 145-150). Mark Paul further testified, however, that all three of the men exhibiting such problems were fired, and by in or around March, 2017, Paul Beverage had in place Patrick O'Hara, who "was doing everything properly and was working out really well." (*Id.*).

During his deposition, Mark Paul also testified that an employee named "Dustin" was accused of stealing "some kind of small package of detergent" from a Dollar General store. (ABC's Exh. B, PP. 104-105). Although Dustin was never prosecuted for the theft, and Mark Paul testified he could not verify the theft from watching the store video[3], Dollar General asked that Dustin not be allowed back into any of its stores. (*Id.*, PP. 104-106). Dustin was again accused of stealing in 2017, this time a hot dog. (*Id.*, P. 224; *see also* Plaintiff's Response to ABC's Facts, ¶ 21). After speaking to both the customer and the employee, Mark Paul stated he was unable to determine whether Dustin intended to steal the hot dog or simply forgot to pay at the time. (*See* Paul Beverage's Response to ABC's Facts, ¶¶ 21, 22, citing Mark Paul Decl., ¶¶ 24-26).[4] Paul Beverage eventually paid for the hot dog, and gave the employee a warning. (*Id.*). Paul Beverage did not terminate Dustin's employment; instead he remained an employee of Plaintiff's until its Agreement with ABC was terminated. (*Id.*; *see also* ABC's Exh. B, P. 106; Excerpts of Mark Paul Deposition, attached to ABC's Facts as Exh. D, PP. 130-132). According to Plaintiff, although ABC was informed of how Paul Beverage handled the incidents involving

---

3 Mark Paul asserts the Dollar General representative agreed the video was inconclusive. (*See* ABC's Exh. B, P. 104).
4 Again, Mark Paul maintains the customer at issue agreed the employee may simply have forgotten to pay for the hot dog. (*See* Mark Paul Decl., ¶ 26).

Dustin, it neither objected to the treatment nor instructed Plaintiff to fire Dustin. (*See* Plaintiff's Response to ABC's Facts, ¶¶ 20, 21, citing Mark Paul Decl., ¶¶ 27-28; *see also* Plaintiff's Facts, ¶¶ 59-60). Furthermore, it is undisputed that both customers involved in the alleged incidents of employee theft continued to purchase ABC products through Paul Distributing. (Plaintiff's Response to ABC's Facts, ¶¶ 20, 21, citing Mark Paul Decl., ¶ 29; *see also* Plaintiff's Facts, ¶ 61).

Mr. Mark Robert Paul, Mark Paul's son and a Paul Beverage employee, testified as follows regarding the behavior of another Paul Beverage employee:

> Q (by ABC's attorney, quoting from an exhibit)     "Bob, the driver, attempted delivery on Monday. Claims the owner parked his truck in front of the curb ramp and would not move his vehicle. Bob took a picture of the truck and then allegedly started arguing and cursing with the owner when he asked him to move the vehicle.
> "Bob made the decision to not deliver. He returned with the cases, which were delivered on Tuesday by Mike Cobb and Drew."
> Do you have any recollection of this event?
>
> A (by Mr. Paul)     I vaguely remember that event taking place.

(*See* Excerpts of Mark Robert Paul Deposition, attached to ABC's Facts as Amended Exh. C, P. 169). Mark Paul later testified that after speaking with the customer regarding the incident, the company terminated the employee, and the customer continued to utilize the services of Paul Beverage. (*See* Supplemental Declaration of Mark W. Paul, ECF No. 59-1, ¶¶ 4-6).

In an email sent November 1, 2016, Mr. Parish informed Mr. Moore that he and Mark Paul had met with management from the Schnucks Vogel location, who complained about merchandising issues at the location. (ABC's Facts, ¶ 26, citing attached Exh. E). In a follow-up email sent November 4, 2016, Mr. Parish reported that although Mark Paul had promised to service the store by 9:30 a.m., the merchandiser did not arrive until approximately 10:15 a.m. (*Id.*). Plaintiff counters that it had merchandised the store, but that it had done so earlier than

usual, so the later merchandiser visit was a "double back." (Plaintiff's Response to ABC's Facts, ¶ 26, citing Paul Beverage Corporate Representative Dep., attached to Plaintiff's Facts as Exh. 5, PP. 100-101).[5]

Beginning on April 4, 2017, Mr. Moore and Mr. Green sent a series of letters to Mark Paul, detailing specific examples of alleged failures on the part of Paul Beverage. (*See* ABC's Exhs. G, H, I, J). Eventually Dan Schmidt, Area Director for the western part of Illinois and two-thirds of Missouri, and Bob Matson, then Regional Vice-President, Mid-South, made the decision to terminate Paul Beverage's distributorship. (Declaration of Dan Schmidt in Support of Motion for Summary Judgment, ¶¶ 3, 17; ABC's Facts, ¶ 37). According to ABC, no other managers were decision-makers regarding the termination. (ABC's Facts, ¶ 38). Schmidt maintains he and Matson relied on examples of Paul Beverage employees being rude to customers or behaving in ways that reflected badly on ABC, Paul Beverage's failure to provide effective, consistent and regular distribution of ABC's products to retail outlets by means of store door delivery and shelf stocking, and its failure aggressively to market ABC's products in reaching their decision. (*Id.*, ¶¶ 39-41).)

On July 28, 2017, Schmidt delivered a letter to Mark Paul at Paul Beverage, terminating the distributorship. (ABC's Facts, ¶ 44). The letter stated in relevant part as follows:

> The Agreement requires, among other things, that within its market area of responsibility (the "Territory"), Paul Beverage: provide effective, consistent and regular distribution, and timely deliveries of the Company's products to retail outlets by means of store door delivery and shelf stocking; and aggressively promote the distribution of the Company's products.
>
> During recent months the Company has notified Paul Beverage, verbally and in writing, of its failure to satisfy the referenced requirements set forth in the

---

5 ABC also presents email evidence from May, 2016, in which Mark Paul admitted that one of Paul Beverage's merchandisers was "bad", but that he was in the process of being replaced. (ABC's Facts, ¶ 27, citing attached Exh. F).

Agreement, including numerous resulting customer complaints about Paul Beverage's service. One of the purposes of the notices was to provide Paul Beverage the opportunity to correct deficiencies in its practices and operations so that it could meet the standards and requirements of the Agreement. Despite our prior notices, including warnings that the seriousness of such issues may warrant termination, Paul Beverage has not adequately addressed prior issues and service failures continue. Without limitation, these include continued lack of service at accounts, a continued lack of response to our inquiries about issues, and frequent unsolicited complaints about Paul Beverage from customers. The Company has determined that Paul Beverage is either not able or is not willing to improve the service provided to its customers and its failure to do so constitutes a material failure to comply with the terms of the Agreement.

Consequently, this is notice to Paul Beverage that pursuant to Section IV.B of the Agreement, the Company is terminating the Agreement, effective August 28, 2017. During the next thirty days, the Company will service the customers and otherwise operate within the Territory. At the conclusion of the thirty day period, Paul Beverage will be paid the allowances it would have earned had it made the sales that the Company makes during the period. As provided under the Agreement, we will also work with you regarding the purchase of existing trucks.

(*See* July 28, 2017 Termination Letter, attached to ABC's Facts as Exh. L).

Paul Beverage filed its original Complaint in this matter on November 2, 2017. (ECF No. 1). In its First Amended Complaint, filed June 18, 2018, Paul Beverage asserts one count for breach of contract, and one count for breach of the implied covenant of good faith and fair dealing. (ECF No. 24).

On July 2, 2018, ABC filed its Answer and Affirmative Defenses to Plaintiff's First Amended Complaint and Counterclaim. (ECF No. 28). In its Counterclaim, ABC maintains that "Plaintiff's failure to provide effective, consistent and regular distribution, to timely deliver ABC's products to retail outlets, and aggressively promote the distribution of ABC's products", constituted a material breach of the Agreement that resulted in damages to ABC. (Counterclaim, ¶¶ 3, 4).

As stated above, ABC filed the instant Motion for Summary Judgment on December 6, 2018, asserting ABC is entitled to judgment as a matter of law on both Paul Beverage's claims.

(ECF No. 40). Specifically, ABC maintains Paul Beverage's breach of contract claim must be dismissed because (1) Paul Beverage cannot establish that ABC breached any contractual obligations by terminating its contract with Paul Beverage, and (2) Paul Beverage cannot demonstrate that it performed or tendered performance under its contract with ABC. ABC further maintains Paul Beverage's breach of the implied duty of good faith and fair dealing claim must be dismissed because (1) Missouri law prohibits such a claim where, as here, the uncontroverted facts establish that express contractual provisions permitted ABC's actions, and (2) there are no facts showing ABC did anything intended to evade the spirit of the contract or undermine the contract.

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id*.

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex*, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*,

477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Id.* at 249.

## DISCUSSION

### I. Breach Of Contract (Count I)

Under Missouri law, a "'breach of contract action includes the following essential elements: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff.'" *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 850 (8th Cir. 2014) (quoting *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. 2010) (en banc)). The burden of proof rests with the party claiming breach of contract, and if said party fails to prove one element, its claim fails. *See Chavis Van & Storage of Myrtle Beach, Inc. v. United Van Lines, LLC*, 784 F.3d 1183, 1189 (8th Cir. 2015); *HM Compounding Services, LLC v. Express Scripts, Inc.*, 349 F.Supp.3d 781, 790 (E.D. Mo. 2018).

In its Motion for Summary Judgment, ABC claims that summary judgment in its favor is warranted because Paul Beverage can establish neither its own performance under the contract, nor ABC's breach thereof. The arguments are related and thus the Court will address them together.

In Count I of its First Amended Complaint, Paul Beverage alleges ABC violated the terms of the Agreement because its termination was not based on any grounds found in the

Agreement. (First Amended Compl., ¶ 37). ABC counters that it had the express contractual right to terminate the Agreement. (Memorandum in Support of Defendant The American Bottling Co.'s Motion for Summary Judgment ("ABC's Memo in Support"), P. 5). As support for this assertion, ABC reiterates it had the right to terminate the Agreement upon thirty days' written notice for any of the following reasons: for failure of Paul Beverage aggressively to promote the sale of ABC's Scheduled Products within Paul Beverage's market area of responsibility; for any dishonest act by Paul Beverage to its customers or to ABC; for conduct of Paul Beverage detrimental or not appropriate to the business of distribution of ABC's beverages and products; or for material failure to comply with the terms of the Agreement. (*Id.*, PP. 6-7). ABC continues to detail the manner in which Paul Beverage allegedly failed to live up to each of its obligations, thereby entitling ABC to terminate the Agreement. (*Id.*, PP. 7-10). The Court will address ABC's contentions in turn.

With respect to Plaintiff's alleged failure aggressively to promote the distribution of ABC's products, ABC points to Paul Beverage's "performance, or lack thereof, in ABC's incentive program." (ABC's Memo in Support, P. 7). ABC maintains that from 2015 to 2017, it tracked Paul Beverage's incentive performance in relation to three similar distributors, and found that Plaintiff failed to meet the incentives goals on many more occasions than the others. (*Id.*).

In response, Plaintiff first notes the term "aggressively promote" is specifically defined in the Agreement, and requires two actions: that Plaintiff or its employees (1) "call on soft drink outlets in all segments within its market area of responsibility a minimum of five (5) days per week", and (2) "service the outlets with such minimum frequency so to comply with Company's Policy Bulletins issued and reviewed periodically." (Plaintiff's Memorandum in Opposition to Motion for Summary Judgment ("Plaintiff's Opp."), P. 6, quoting Agreement, § I.D). Plaintiff

asserts the definition makes no reference to ABC's incentives program, and thus ABC's evidence regarding such is irrelevant. (*Id.*).

Plaintiff further maintains that even if relevant, as noted above ABC's evidence does not establish unsatisfactory performance on the part of Plaintiff. (Plaintiff's Opp., P. 7). Rather, Plaintiff asserts the document cited by ABC, Defendant's Exhibit B, actually reflects that Paul Beverage met as many or more incentive levels in numerous months than one or more of the comparison distributors. (*See* Plaintiff's Response to ABC's Facts, ¶ 11). Plaintiff also contends ABC often hindered Plaintiff's ability to meet goals, and failed to give Plaintiff proper credit for goals met. (Plaintiff's Opp., P. 7; *see also* Plaintiff's Facts, ¶¶ 55, 56). Finally, Plaintiff notes that to the extent other promotional activities are relevant, it was active in the community and promoted ABC's products accordingly. (*See* Plaintiff's Opp., P. 7; Plaintiff's Facts, ¶ 58).

Upon consideration, the Court finds the foregoing sufficient to create a genuine issue of material fact as to whether Plaintiff aggressively promoted ABC's products, as required by the Agreement. It necessarily follows that a genuine issue of material fact exists as to whether ABC had the right to terminate the Agreement based on Plaintiff's alleged failure to promote, and so this portion of ABC's Motion for Summary Judgment must be denied.

ABC next asserts it had a right to terminate the Agreement because Paul Beverage employees conducted themselves in a manner that was both inappropriate and detrimental to the distribution of ABC's products. (ABC's Memo in Support, P. 9). ABC cites to three specific examples in support of this assertion: a Paul Beverage employee being asked not to return to a customer's store because the customer believed he was stealing; that same employee being caught stealing from another customer; and a different Paul Beverage employee engaging in a heated argument with a customer. (*Id.*, PP. 9-10).

With respect to the two alleged thefts, Plaintiff counters that it responded promptly and rectified the situations. (Plaintiff's Opp., PP. 10-11). Specifically, Plaintiff asserts Mark Paul met with both customers, and neither he nor the customers at issue ever confirmed the alleged thefts. (*Id.*, citing Plaintiff's Response to ABC's Facts, ¶¶ 20, 21). Plaintiff further notes both customers continued to purchase product from ABC after the incidents. (*Id.*). Finally, while Mark Robert Paul acknowledged "vaguely" remembering the issue regarding an employee's argument with a customer, Mark Paul testified that after speaking with the customer regarding the incident, the company terminated the employee, and the customer continued to utilize the services of Paul Beverage. (*See* Supplemental Declaration of Mark W. Paul, ECF No. 59-1, ¶¶ 4-6).

Upon consideration of the foregoing, the Court again finds a fact question remains regarding whether ABC appropriately terminated the Agreement on the basis of Paul Beverage employees' allegedly inappropriate and/or detrimental behavior. In other words, Plaintiff presents evidence that two of the three incidents did not transpire as depicted by ABC, and that none of the three incidents had any detrimental effect on ABC or its business. Under these circumstances, this portion of ABC's motion must be denied.

Finally, ABC asserts it properly terminated the Agreement because Paul Beverage failed to provide effective, consistent and regular distribution of ABC's products to retail outlets. (ABC's Memo in Support, P. 7). As support for this assertion, ABC points to Mark Paul's acknowledgment that Paul Beverage's drivers at times failed to complete their deliveries during the day because they did not want to dig in their trucks for product. (*Id.*, PP. 7-8, citing ABC's Facts, ¶¶ 16-19). ABC further maintains Paul Beverage's merchandisers failed to provide effective, consistent and regular distribution of ABC's products to retail outlets by means of

shelf stocking. (*Id.*, P. 8, citing ABC's Facts, ¶¶ 25-28). ABC asserts that although it sent Plaintiff a series of letters detailing the complaints and offering suggestions for improvement, the problems continued. (*Id.*, P. 9, citing ABC's Facts, ¶¶ 32-33, 36). ABC maintains these problems constituted "material failure[s] to comply with the terms of [the] Agreement," and as such, allowed ABC to terminate the Agreement. (*Id.*).

In response, Plaintiff asserts that to the extent it failed to meet its obligations, said failures were due to "significant and regular problems ABC itself created." (Plaintiff's Opp., P. 5). For example, Plaintiff maintains "ABC's own acts regarding cross-docking[6], failure to support sales activity, and failure to provide information to Plaintiff regarding alleged customer complaints" created challenges for Plaintiff. (*Id.*). Plaintiff further maintains ABC had no process to investigate and record the root cause of customer complaints, and admitted that complaints related to issues that were the fault of ABC rather than Plaintiff would not warrant termination under the Agreement. (*Id.*). Finally, Plaintiff asserts that even if allegations of isolated issues were both true and the fault of Paul Beverage, there is at least a fact question as to whether the failures were material. In other words, according to Plaintiff, the "mere fact of a customer complaint is not indicative of a material failure to perform", because in a service industry such as Plaintiff's every distributor receives customer complaints. (*Id.*, P. 9).[7] Plaintiff notes at the time of termination it had over 200 customers, and therefore minimal instances of

---

6 As noted above, Plaintiff maintains the switch to cross-docking resulted in late deliveries of product, fallen or damaged product, delivery of incorrect trailers and unavailable product, which in turn created challenges for both timely delivery and merchandising. (Plaintiff's Opp., P. 5).
7 With respect to the specific examples cited by ABC, Plaintiff responds that ABC showed only some occasions during a two-year period where deliveries were not completed, and Paul Beverage terminated the drivers at issue. (Plaintiff's Opp., P. 9). Plaintiff further asserts ABC's allegations regarding merchandising issues rely on inadmissible hearsay, and that Mark Paul's statement characterizing Plaintiff's own merchandisers as bad in fact referred only to a single merchandiser who was in the process of being replaced. (*Id.*).

missed deliveries and/or late or missed merchandising, without regard to cause, cannot be deemed material as a matter of law. (*Id.*, citing Plaintiff's Facts, ¶ 49).

It is true that under Missouri law, "'a party to a contract who prevents or hinders the other party from executing its obligations under the contract cannot rely on the other party's non-performance to escape its obligations under the contract.'" *Wash Solutions, Inc. v. PDQ Manufacturing, Inc.*, 2003 WL 25737112, at *6 (E.D. Mo. Apr. 14, 2003) (quoting *Ken Cucchi Constr. v. O'Keefe*, 973 S.W.2d 520, 526 (Mo. App. 1998) (citation omitted)). ABC denies it played a role in the problems experienced by Plaintiff, however, and further asserts that "even if ABC were responsible for 'challenges' experienced by Paul Beverage on occasion, Paul Beverage cannot cite any evidence that ABC relied solely on these occasions to terminate the Agreement." (ABC's Memo in Support, P. 6).

Upon consideration, the Court once again finds fact questions sufficient to support the denial of ABC's motion remain. The Court is mindful that from ABC's perspective, it did everything required of it before terminating the Agreement. In other words, ABC sent Plaintiff numerous letters detailing the alleged issues and offering support before finally ending the relationship in July, 2017. While these actions may suffice to convince a jury that ABC's termination was justified, they would do so only after the jury resolved fact questions including whether ABC caused the very problems it relied on for termination, and whether the cited problems constituted a material failure to comply with the terms of the Agreement. Such determinations are for the finder of fact to resolve, not the Court, and so this portion of ABC's Motion for Summary Judgment must be denied.[8]

_____

8 ABC devotes a small portion of its motion to the assertion that the relief sought by Paul Beverage is unavailable under the law. (*See* ABC's Memo in Support, PP. 11-12). Upon consideration, the Court finds ABC's argument is not fully developed, sufficient to permit a

## II.    Breach Of The Implied Covenant of Good Faith And Fair Dealing (Count II)

In Count II of its Complaint, Paul Beverage alleges that with its actions, ABC breached the covenant of good faith and fair dealing.  (First Amended Compl., ¶¶ 40-47).  Specifically, Plaintiff maintains ABC failed appropriately to support and/or impaired Plaintiff's ability to distribute ABC's products by, among other things:  "Inducing Plaintiff to agree to 'cross-docking' of inventory and then failing to timely provide inventory sufficient to meet Plaintiff's needs; Withholding and/or failing to make timely payments due to Plaintiff thereby negatively impacting Plaintiff's ability to service customers; Withholding or failing to timely provide promotional materials requested by Plaintiff; Delaying or failing to timely follow up with customer requests submitted to Defendant by Plaintiff; Failing to provide Plaintiff with consistent access to and adequate training on management tools including, but not limited to, Route Manager software; and Failing to provide Plaintiff with timely and specific information regarding customer service issues sufficient to allow Plaintiff to promptly remedy service issues."  (*Id.*, ¶ 44).

Under Missouri law, "a covenant of good faith and fair dealing is implied in every contract."  *CitiMortgage, Inc. v. Chicago Bancorp, Inc.*, 808 F.3d 747, 751 (8th Cir. 2015) (citation omitted).  "This covenant prevents one party from acting in a manner that evades the spirit of the transaction or that denies the other party the expected benefit of the contract."  *Edoho v. Board of Curators of Lincoln University*, 344 S.W.3d 794, 799 (Mo. App. 2011) (citation omitted).  It is well settled, however, "that there is no breach of the covenant where the parties' agreement expressly permits the actions being challenged, and the party acted in

---

ruling on summary judgment.  Further, while ABC acknowledges its assertion may be the proper subject of a motion to strike, no such motion has been filed.  The Court notes, however, that the burden will be on Plaintiff to establish at trial both its entitlement to damages and the amount thereof.

accordance with the agreement." *Citimortgage, Inc. v. OCM Bancorp, Inc.*, 2011 WL 1594950, at *3 (E.D. Mo. Apr. 27, 2011) (citation omitted). *See also Glenn v. HealthLink HMO, Inc.*, 360 S.W.3d 866, 877-78 (Mo. App. 2012) (citations omitted) ("However, an implied covenant will not be imposed where the parties expressly address the matter at issue in the contract. Nor does a party breach its implied duty of good faith and fair dealing by ending a contractual relationship in the manner provided by the contract.").

In its Motion for Summary Judgment, ABC first asserts Plaintiff's claim for breach of the implied covenant of good faith and fair dealing cannot lie because the complained-of action, i.e., ABC's termination of the Agreement, was expressly permitted by the parties' Agreement. (ABC's Memo in Support, P. 13). As noted above, however, the Court finds fact questions remain with respect to whether ABC had the right to terminate under the express terms of the Agreement.

ABC continues to assert, however, that Plaintiff's claim also fails because "Paul Beverage has admitted that none of the acts alleged and complained of were performed on the part of ABC with the intention of 'scuttling the deal.'" (ABC's Memo in Support, P. 14). As support for this proposition, ABC points to deposition testimony from Mark Paul as follows:

> Q (by ABC's attorney)       Are you claiming that Dr. Pepper Snapple Group failed to timely provide inventory or had out-of-stock situations to undermine the contract with HL Paul Distributing?
>
> A (by Mark Paul)     I'm saying there were numerous out-of-stocks that there shouldn't have been. But I'm not saying it's to undermine HL Paul Distributing Company.
>
> Q      Have we talked about all payments that you claim Dr. Pepper Snapple Group owes to HL Paul Distributing or Paul Beverage?
>
> A      To the best of my knowledge, yes.

Q      Do you feel that Dr. Pepper Snapple Group was—did not make those payments in what you considered to be a timely fashion for the purpose of undermining the contract with HL Distributing?

A      I can't say.  I don't know….

Q      What specific promotional materials do you claim Dr. Pepper Snapple Group didn't timely provide to you?

A      I think it was partly addressed in my sent emails.

Q      Are you talking about those shippers and things like that?

A      Yes.  Which prevented us from hitting the incrementals, the final incremental.

Q      And is it your position that Dr. Pepper Snapple Group was not giving you shippers or promotional material in an attempt to undermine their contract with you and get rid of you?

A      I'm not sure it was intentional and I'm not going to claim it was….

Q      And again, is it your company's position that Dr. Pepper Snapple Group didn't provide training on the handhelds and iPads to your employees as a way to undermine the contract with HL Paul Distributing?

A      I can't say what their motivation was.

(*See* ABC's Exh. B, PP. 203, 208, 218).

In its response Paul Beverage asserts that nothing in the law requires it to demonstrate that ABC intentionally tried to "scuttle the deal."  (Plaintiff's Opp., P. 17).  Rather, Plaintiff maintains it need only show that ABC's actions evaded the spirit of the Agreement by first impairing Plaintiff's ability to perform, and then using performance issues to justify terminating the Agreement.  (*Id.*).

Upon consideration the Court disagrees with Plaintiff, instead finding that intent is a necessary factor in considering a claim for breach of the implied covenant of good faith and fair dealing.  The Eighth Circuit confirmed as much in a recent opinion, as follows:

And even if CMI erroneously exercised its "sole and exclusive discretion" under the contract, Bancorp has not provided evidence to establish that CMI acted in bad faith. It is not enough "to show that a party invested with discretion made an erroneous decision." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 914 (8th Cir. 2007) (interpreting Missouri law). Rather, Bancorp was required to provide evidence that CMI exercised its discretion in a way *intended* "to evade the spirit of the transaction or…to deny [Bancorp] the expected benefit of the contract." *Id.* (noting that it is insufficient to provide evidence that a discretionary determination "was flawed or unreasonable") (citation omitted); *see also Armour & Co. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993) (noting that "[c]onclusory affidavits do not provide a basis upon which to deny motions for summary judgment").

Bancorp has presented no evidence that CMI exercised its discretion under the agreement in a manner *intended* to sabotage or evade the spirit of the agreement or to deny Bancorp the expected benefit of its bargain. *See BJC Health Sys., 478 F.3d at 914 (noting that the burden of proof is on the party asserting a bad-faith exercise of discretion).* Accordingly, we conclude that the district court did not err in granting summary judgment on the….loans.

*CitiMortgage, Inc. v. Chicago Bancorp, Inc.*, 808 F.3d 747, 752 (8th Cir. 2015) (emphasis added). In so holding, the Eighth Circuit affirmed that in order to make a claim of breach of the implied covenant of good faith and fair dealing, a party must assert the alleged offender exercised its discretion in a manner *intended* to evade the spirit of the transaction, or to deny the other party the expected benefit of the contract. *Id.* Plaintiff makes no such claim here, and so ABC's Motion for Summary Judgment on Count II of Plaintiff's First Amended Complaint must be granted.

## <u>CONCLUSION</u>

Accordingly,

**IT IS HEREBY ORDERED** that Defendant The American Bottling Company's Motion for Summary Judgment (ECF No. 40) is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing.


Dated this 5th Day of March, 2019.


/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE